# EXHIBIT A

Electronically Filed
8/9/2019 3:36 PM
Seventh Judicial District, Bonneville County
Penny Manning, Clerk of the Court
By: Angelica Linares, Deputy Clerk

John A. Bailey, Jr., ISB No. 2619
HAWLEY TROXELL ENNIS & HAWLEY LLP
412 West Center Street
Suite 2000
Pocatello, ID 83204
Telephone: (208) 233-2001
Facsimile: (208) 232-0150
Email: jbailey@hawleytroxell.com

*Attorneys for Plaintiff VNS Federal Services, LLC*

## IN THE DISTRICT COURT SEVENTH JUDICIAL DISTRICT

## FOR THE STATE OF IDAHO, IN AND FOR THE COUNTY OF BONNEVILLE

| | | |
|---|---|---|
| VNS FEDERAL SERVICES, LLC,<br>295 Bradley Blvd, Suite 300<br>Richland, WA 99352 | ) <br> ) <br> ) <br> ) | Case No. CV10-19-5108 _____ |
| | ) | **COMPLAINT** |
| Plaintiff, | ) <br> ) | |
| vs. | ) <br> ) | |
| PORTSMOUTH MISSION ALLIANCE,<br>LLC,<br>1425 Higham Street<br>Idaho Falls, Id 83402 | ) <br> ) <br> ) | |
| Defendant. | | |

---

For its Complaint, Plaintiff VNS Federal Services, LLC (VNSFS) states as follows:

### PARTIES, JURISIDICTION AND VENUE

1.       VNSFS is a Delaware limited liability company with its principal place of business in Richland, Washington.  VNSFS provides support services to sites operated by the United States Department of Energy (DOE) as both a prime contractor and subcontractor at various DOE facilities around the country.  These services include physical security, information

COMPLAINT – Page 1

technology support, records keeping, cybersecurity, and nuclear and hazardous waste management.

2.      Portsmouth Mission Alliance, LLC (PMA) is an Ohio limited liability company with its principal place of business in Piketon, Ohio.  PMA is a joint venture formed for the purpose of providing infrastructure support services at the United States Department of Energy's Gaseous Diffusion Plant in Piketon, Ohio.

3.      Jurisdiction and venue are proper in this Court pursuant to the forum selection clause of the contract between the Parties.

**FACTUAL BACKGROUND**

4.      DOE operates a gaseous diffusion plant in Piketon, Ohio at which it enriched uranium for use in the United States nuclear arsenal.  DOE ceased enriching uranium at the facility began and decontaminating and decommissioning (D&D) the plant.  The D&D work is the principal activity at the Piketon facility.

5.      In early 2015, DOE issued solicitation No. DE-SOL-0006421 for the Portsmouth Infrastructure Support Services Contract in Piketon, Ohio (the "ISS Work").  The general purpose of the ISS Work is to provide support services required by the D&D contractor – ranging from physical security of the facility to janitorial services.

6.      North Wind, LLC and Swift & Staley, Inc. formed PMA as a joint venture for the purposes of pursuing the ISS Work.

7.      Wastren Advantage, Inc. (WAI) was a corporation that provided site support services to DOE sites around the country, including the facility in Piketon.

8.      On February 26, 2015, PMA entered into a teaming agreement with WAI under which WAI would utilize its expertise and experience at the Piketon site to aid PMA in preparing

its proposal for the ISS Work.  In exchange for this assistance, PMA agreed that WAI would act as a major subcontractor for the ISS Contract.

9.      DOE awarded PMA a fixed price contract for the ISS Work which was memorialized as Prime Contract No. DE-EM000-4062 (the "Prime Contract").

10.     On April 14, 2016, PMA and WAI entered into Subcontract No. PMA-S.07 under Prime Contract No. DE-EM000-462 (the "Subcontract", attached as Exhibit A).  This was a fixed price subcontract for three separate scopes of work.  PMA and WAI further agreed to share in the fee which PMA received from DOE under the Prime Contract.

11.     WAI was responsible for three major scopes of work:

a.  *Safeguards and Security (S&S)*:  This included physical security, program management operations, and personnel security (e.g., individual security clearances);

b.  *Computing, Telecommunications and Cyber Security*:  Here, WAI provided IT support, cyber security services, and telecommunications support.

c.  *Records Management and Document Control*:  Under this scope of work, WAI maintained, managed and, as needed, disposed of the documents created at the Piketon site.

12.     In January 2018, VNSFS purchased the stock of WAI and assumed WAI's responsibilities under the subcontract.

13.     On August 3, 2018, PMA assumed the Safeguards and Security scope of work from VNSFS after lengthy negotiations.  PMA also increased its fee and, correspondingly, reduced the fee shared with VNSFS.

14.     VNSFS' remaining scope consisted of the IT/cybersecurity and records management functions.

15.     Of these remaining scopes of work, cybersecurity was the smallest and represented only approximately ten percent of the overall value of the work.

16.     As part of its cybersecurity obligations, VNSFS kept PMA informed of the status of the cybersecurity system in various ways.  VNSFS utilized the Risk Tracking System (RTS) to identify cybersecurity risks and suggested possible remedies in the RTS system.  DOE had direct access to and knowledge of these entries.  Moreover, VNSFS advised PMA of the identified risks in a bi-weekly meeting.  No action was taken by either DOE or PMA regarding these identified risks or suggested remedies.  VNSFS had no ability to institute any corrective actions without DOE or PMA approval.

17.     In addition to the RTS, VNSFS' project leadership reported to PMA personnel issues they learned of from VNSFS' cybersecurity personnel.  PMA changed this reporting structure so that VNSFS' cybersecurity employees no longer reported to VNSFS management. Instead, VNSFS reported directly to PMA's project manager, Damon Detillion.  In doing so, PMA took active control of the cybersecurity function.

18.     In early 2019, DOE informed PMA and VNSFS that representatives from DOE's Office of Enterprise Assessments in Washington, DC would be performing a review of the Piketon facility's cybersecurity systems in April.

19.     Starting in February 2019, PMA and VNSFS worked together to prepare for this review.  Representatives from both companies regularly met to discuss the current status of the system, what may be expected in the audit, and how potential items may be handled.

20.     DOE conducted its review between April 15 and 18, 2019.

21.     On April 18, 2019 DOE conducted a debriefing to outline its findings.   That review identified ten items that required attention.   These ranged from clarifying written procedures to software repairs on discrete elements of the system to address vulnerabilities. DOE requested a Corrective Action Plan to address these concerns.

22.     Following the debriefing, PMA and VNSFS met to create the Corrective Action Plan.   This plan was to outline the short, medium, and long-term steps to be taken for each item along with a timeline to complete the tasks.   PMA included two additional items not contained in the DOE defriefing.   VNSFS then created a spreadsheet of the outstanding items and a general description of the work needed to resolve each.   (See Exh. B)

23.     PMA brought in Craig Opperman, a project manager from North Wind, to put a schedule together for these remediation efforts (the "PMA Recovery Schedule"; Exh. C).   The PMA Recovery Schedule included the short, medium and long-term milestones for each activity. The average time to complete each item averaged 214 days.

24.     Upon information and belief, the time frames in the PMA Recovery Schedule were incorporated into the Corrective Action Plan.

25.     On April 23, 2019, PMA notified VNSFS that it engaged an outside cybersecurity consultant to review the issues raised in DOE's debrief and demanded VNSFS cooperate with this consultant.

26.     Throughout April and May, VNSFS worked with PMA to complete the Corrective Action Plan and cooperated with PMA's outside consultant.

27.     By May 31, 2019, VNSFS also achieved the short-term milestones in the PMA Recovery Schedule.   PMA knew of VNSFS' efforts as VNSFS made a request to DOE, through PMA, that DOE close eight of the ten items.

28.     While VNSFS worked to resolve the issues raised by DOE, PMA began concocting its scheme to improperly terminate VNSFS.

29.     First, PMA denied VNSFS access to relevant information.   Namely, PMA refused VNSFS' requests for a copy of the third-party consultant report as well as the Corrective Action Plan.

30.     PMA refused to provide this information in an effort to hamper VNSFS' ability to address issues raised by DOE.

31.     Next, PMA entered negotiations for Leidos to replace VNSFS as its subcontractor prior to sending any default notice to VNSFS.     These discussions resulted in a subcontract between PMA and Leidos.

32.     On May 20, 2019 and without any notice to VNSFS, Leidos began posting job openings for IT and cybersecurity positions at the Piketon facility.  (See Exh. D)  These jobs were held by VNSFS employees at the time.

33.     On May 21, 2019, the day after Leidos began posting its jobs, PMA sent VNSFS a Notice of Default for the subcontract. (See Exh. E)

34.     This Notice claimed VNSFS was in default based on the findings of DOE's review and demanded VNSFS cure twelve items within ten days.

35.     PMA indicated that if these twelve items were not cured by May 31, 2019 PMA would terminate the entire subcontract – including the general IT services and records management work for which there has been no finding of inadequacy.

36.     PMA stated in its default notice it had "no confidence or reasonable assurance" VNSFS could cure these items.  This made clear PMA elected to terminate the subcontract regardless of what VNSFS was able to accomplish during the ten-day cure period.

**COMPLAINT – Page 6**

37.     PMA had no "confidence or assurance" because it deliberately structured the default notice in a way that made compliance impossible in one of four ways:

a.  *Impossible Time Frame*: PMA understood the timeframe needed to provide complete correction of these issues.  It knew ten days was not sufficient to accomplish a complete cure as many of these items were included on the PMA Recovery Schedule which showed an average completion duration of 214 days.

b.  *PMA As Chokepoint*: One of the new items required the purchase of new hardware by PMA.  PMA held the sole power to approve acquisitions of new equipment.  VNSFS previously requested PMA to purchase new hardware or software to address known issues but such products were never purchased.  Thus, PMA, not VNSFS, controlled the ability of VNSFS to cure.

c.  *Restricting Customer Access*:  PMA prohibited VNSFS from contacting DOE even though some of these issues would require direct input from DOE.  For example, PMA demanded VNSFS restore PMA's Continuous Authority to Operate (ATO) after it had been downgraded to a Fixed ATO.  An ATO acts as permission by DOE for a contractor to operate an IT system that houses DOE information.  A Continuous ATO does not have to be renewed.  In contrast, a Fixed ATO is only valid for a fixed amount of time (usually 1 – 3 years).  A contractor can operate an IT system under either form of ATO.  Since an ATO can only be granted by DOE, it was necessary for VNSFS to deal directly with DOE to cure this issue.  PMA refused to allow any contact with DOE.

d. *Including Item Which PMA Already Agreed Was Not A Default* – One issue raised by DOE required developing improvements to the self-assessment process. VNSFS discussed this with PMA shortly after the DOE debrief review and PMA agreed this matter was not a default under the subcontract but it was a matter that needed to be addressed. In fact, PMA expressly agreed that VNSFS would begin working on this process on May 1, 2019 and would have until August 30, 2019 to complete it.

38.    PMA knew VNSFS was already working on resolving these issues before it issued its Notice. For example, PMA and VNSFS agreed VNSFS was to provide VNSFS' remedy on six of DOE's items on Thursday, May 23 and then provide its solutions on additional two items the week of May 27. VNSFS met these deadlines but PMA terminated VNSFS anyway.

39.    On May 22, 2019, PMA submitted to DOE the Corrective Action Plan that VNSFS helped prepare. VNSFS requested a copy of the Corrective Action Plan and PMA refused.

40.    In addition to knowingly creating impossible deadlines, PMA deliberately interfered with VNSFS' relationship with current employees by encouraging them to submit applications to either Leidos or PMA for their current VNSFS jobs:

a. On May 20, 2019, the day before PMA sent its default notice, Leidos began advertising job openings at the Piketon plant for positions such as cybersecurity manager and information technology manager. (Exh. D)

b. On May 22, 2019, PMA and its majority owner, North Wind, posted job openings for a records management document control clerk. (Exh. F)

    c.   On May 30, 2019, PMA sent an email to VNSFS employees in the IT and cybersecurity sections providing a link to Leidos' website.  This link provided an application for "Incumbent Capture" or, in other words, a means for current VNSFS employees to be hired by Leidos. (Exh. G)

41.    Taken together, PMA's actions demonstrate that it pre-ordained the termination of VNSFS prior to ever providing the default notice in that:

    a.   PMA negotiated and executed a subcontract with Leidos for the cybersecurity and IT scopes of work prior to notifying VNSFS of the alleged defaults.

    b.   Leidos began listing jobs currently held by VNSFS employees before the default notice was sent to VNSFS.

    c.   Before VNSFS had the opportunity to respond to the default notice, PMA listed jobs currently held by VNSFS employees and directly contacted VNSFS employees to encourage them to apply to Leidos for the positions they currently hold with VNSFS.

    d.   PMA issued the default notice while knowing that VNSFS had been cooperating with PMA for over a month on developing a Corrective Action Plan and related schedule of activities.

    e.   PMA issued the default notice while knowing that VNSFS had made progress on correcting the issues raised by DOE.

    f.   PMA constructed a ten-day cure period which it knew was impossible to meet since the timeframes set out in the PMA Recovery Schedule and, upon information and belief, the Corrective Action Plan, called for an average duration of 214 days to fully complete any remediation plan.

**COMPLAINT – Page 9**

g.  PMA included items which were out of VNSFS' ability to cure without specific action by PMA effectively allowing PMA to hold the cure process hostage.

h.  PMA impeded the ability of VNSFS to cure the issues by prohibiting VNSFS the ability to contact DOE regarding VNSFS' cure activities.

i.  PMA impeded the ability of VNSFS to cure the issues by denying VNSFS access to relevant information that could be of assistance in these ongoing efforts such as a copy of the Corrective Action Plan and the results from the review by PMA's third-party cybersecurity consultant.

j.  PMA impeded the ability of VNSFS to cure the issues by prohibiting VNSFS' project manager and assistant project manager from being involved at all in managing the cure process.

k.  PMA  terminated the entire contract despite the fact that the alleged defaults relate to a scope of work that represents no more than thirteen percent of the contract value and only five out of VNSFS' thirty-three workers on the project especially given there had been no complaints about VNSFS' performance of the unimpacted scopes of work.

42.    On May 31, 2019, VNSFS submitted its response to PMA's default notice which, in part, outlined the status of the twelve items in the default notice.  (Exh. H) Specifically, VNSFS noted by that date of the response:

a.    VNSFS had completed the short-term cure milestone goals of 9 of 12 items either before the notice or in the ten-day cure period;

b.    1 of the 12 was moot by prior agreement with PMA;

c.   1 of the 12 (the ATO item) was both immaterial to PMA's performance because it does constitute a breach per the express contractual terms and, even if that were not true, it was  impossible to perform by virtue of PMA's own direction not to contact DOE despite that issue's resolution requiring DOE to take action; and,

d.   1 of the 12 was moot by PMA's own failure to act (i.e., authorize a previously requested procurement).

43.   In short, 75% of the alleged breaches had been cured—or were already cured before PMA's "notice of termination"—and 25% of the alleged breaches are either moot or rendered impossible to cure by virtue of PMA's own conduct.

44.   On June 3, 2019 and despite VNSFS fully and complete response, PMA informed VNSFS it would terminate the subcontract effective June 7, 2019.  (Exh. I)

45.   On June 7, 2019, VNSFS was ousted from the project site and many of its employees went to work for either PMA or Leidos.

46.   VNSFS' business is focused exclusively on the federal government market, generally, and projects at DOE complexes around the country, specifically.  PMA and its members, North Wind and Smith & Staley, are VNSFS' competitors in the DOE market.

47.   VNSFS constantly seeks new contracting opportunities with DOE directly and potential teaming partners.  VNSFS, for example, currently has three major proposals being reviewed by DOE.

48.   VNSFS will be required to disclose PMA's wrongful termination to both teaming partners and the DOE.  PMA's wrongful termination, therefore, will seriously harm VNSFS's ability to win those contracts.

49.     PMA and its members, North Wind and Swift & Staley, are aware of these disclosure requirements and the reputational impact on VNSFS.

50.     In concocting an improper default termination of VNSFS, PMA and its members created an improper competitive advantage over VNSFS in the DOE marketplace.   Indeed, PMA's majority owner, North Wind, is a direct competitor on the largest of the three proposals currently under consideration by DOE and knows about VNSFS' proposal.

## COUNT I:  BREACH OF CONTRACT

51.     VNSFS restates and realleges the allegations contained in the preceding paragraphs by reference.

52.     VNSFS and PMA entered into a contract.

53.     VNSFS performed its obligations under the contract.

54.     PMA, in contrast, breached the contract by wrongfully terminating VNSFS.

55.     Further, in concocting the improper grounds to terminate VNSFS, PMA's actions were egregious, wanton, malicious, and outrageous.

56.     As a direct and proximate result of PMA's breach, VNSFS has suffered direct damages in an amount to be determined at or before trial but, not less than, $1,830,000.

## COUNT II:  BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

57.     VNSFS restates and realleges the allegations contained in the preceding paragraphs by reference.

58.     The Subcontract contained an implied covenant of good faith and fair dealing between the parties.

59.     PMA breached this covenant by:

a.  Negotiating and executing a subcontract with Leidos for the cybersecurity and IT scopes of work prior to notifying VNSFS of the alleged defaults.

b.  Allowing Leidos to list jobs held by VNSFS employees before the default notice was sent to VNSFS.

c.  Listing jobs currently held by VNSFS employees and directly contacting VNSFS employees to encourage them to apply to Leidos for positions they held with VNSFS.

d.  Issuing the default notice while knowing that VNSFS had been cooperating with PMA for over a month on developing a Corrective Action Plan and related schedule of activities.

e.  Issuing the default notice while knowing that VNSFS made progress on correcting the issues raised by DOE.

f.  Mandating a ten-day cure period which it knew was impossible to meet since the timeframes set out in the PMA Recovery Schedule and, upon information and belief, the Corrective Action Plan, called for an average duration of 214 days to fully complete any remediation plan.

g.  Requiring VNSFS to cure items which PMA knew VNSFS could not do without PMA action thereby effectively allowing PMA to hold the cure process hostage.

h.  Impeding the ability of VNSFS to cure the issues by prohibiting VNSFS from contacting DOE.

i.  Impeding the ability of VNSFS to cure the issues by deliberately denying VNSFS access to relevant information that could be of assistance in these

ongoing efforts such as a copy of the Corrective Action Plan and the results from the review by PMA's third-party cybersecurity consultant.

j.   Impeding the ability of VNSFS to cure the issues by prohibiting VNSFS' project manager and assistant project manager from being involved in any way the cure process.

k.   Terminating the entire contract despite the fact that the alleged defaults relate to a scope of work that represents no more than thirteen percent of the contract value and only five out of VNSFS' thirty-three workers on the project especially given there had been no complaints about VNSFS' performance of the unimpacted scopes of work.

l.   Failing to meaningfully and reasonably evaluate the steps VNSFS took to cure the items listed in the default notice.

60.   PMA's breaches of the implied covenant of good faith and fair dealing were willful and not the result of mistake or inadvertence.  PMA knowingly engaged in this conduct to the detriment of VNSFS, knew that its conduct was unfair and unlawful, and engaged in this conduct in bad faith.

61.   As a direct and proximate result of PMA's violation of the covenant of good faith and fair dealing, VNSFS has suffered direct damages in an amount to be determined at trial but, not less than, but not less than $1,830,000.

**WHEREFORE,** VNSFS prays for the following relief from this Court:

(1)   On Count I, a judgement in an amount to be determined at or before trial, but not less than $1,830,000;

(2)   On Count II, a judgement in an amount to be determined at or before trial, but not less than $1,830,000;

**COMPLAINT – Page 14**

(3)      As to both Counts, an award of punitive damages;

(4)      That VNSFS be awarded its attorneys fees incurred in enforcing its rights under the Subcontract; and,

(5)      Such other relief as the Court deems just and proper.

DATED this 9th day of August, 2019.

Respectfully submitted,

                                          */s/ John A. Bailey, Jr.*

John A. Bailey, Jr.
HAWLEY TROXELL ENNIS & HAWLEY, LLP
412 West Center Street, Suite 2000
Pocatello, Idaho 83204
(208) 233-2001
jbailey@hawleytroxell.com

Stephen P. Withee (Ohio Bar No. 0069176)
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, Ohio 43215-3467
(614) 559-7265
swithee@fbtlaw.com
*Pro Hac Vice Application Pending*

John S. Higgins (Ohio Bar No. 0068156)
FROST BROWN TODD LLC
3300 Great American Tower
301 E. Fourth Street
Cincinnati, OH 45202
(513) 651-6950
jhiggins@fbtlaw.com
*Pro Hac Vice Application Pending*

*Attorneys for Plaintiff VNS Federal Services, LLC*