THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VNS FEDERAL SERVICES, LLC,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>PORTSMOUTH MISSION ALLIANCE, LLC,<br><br>　　　　　　Defendant. | CASE NO. C19-0318-JCC<br><br>ORDER<br><br>*FILED UNDER SEAL* |

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 72), and the parties' motions to seal (Dkt. Nos. 71, 84.) Having thoroughly considered the briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for summary judgment and GRANTS the motions to seal for the reasons explained herein.

I. BACKGROUND

This case involves a contract dispute between a contractor and subcontractor stemming from ▇▇▇▇▇ cyber security services the parties provided for the U.S. Department of Energy ("DOE"). It is undisputed that, in January 2016, DOE awarded Defendant a contract (the "Prime Contract") for services at the "Portsmouth Site," a former gaseous diffusion plant in Ohio. (Dkt. No. 21-1 at 7–8.) In April 2016, Defendant agreed to a subcontract with Wastren Advantage Inc. for support under the contract. (Dkt. No. 13-1 at 20–32.) Plaintiff purchased Wastren in January

1  2018 and assumed its responsibilities. (Dkt. No. 72-4 at 4.) Under the subcontract, Plaintiff was
2  responsible for three major scopes of work: Safeguards and Security; Computing,
3  Telecommunications, and Cyber Security; and Records Management and Document Control.
4  (Dkt. No. 51-2 at 2–3.)

5       As part of the prime contract, Plaintiff was required to obtain a Continuous Authority to
6  Operate ("ATO") and maintain it.[1] (Dkt. No. 65-1 at 9.) An ATO is a "formal declaration that
7  security controls have been implemented commensurate with the level of risk and magnitude of
8  harm, are operating as intended, and a satisfactory level of assurance has been achieved by
9  ongoing continuous monitoring activities." (Dkt. No. 72-8 at 4.) Only a DOE Authorizing
10 Official ("AO") may grant or deny an ATO. (Dkt. No. 72-2 at 14–15.) DOE issued a Continuous
11 ATO for the relevant portion of the IT system in March 2017. (Dkt. No. 72-6 at 9–10.)

12      In April 2019, DOE's Office of Enterprise Assessments ("OEA") representatives audited
13 the Portsmouth Site's cybersecurity systems. (Dkt. No. 51 at 3.) After the audit, OEA shared its
14 preliminary results with Defendant. (Dkt. No. 72-7 at 7–8, Dkt. No. 72-11.) Plaintiff and
15 Defendant began to work together to address the preliminary findings. (Dkt. No. 72-6 at 16–18.)
16 Shortly after the audit, Defendant sent a letter to Plaintiff expressing concerns about work done
17 under the subcontract, based on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Dkt. No.
18 72-12.)

19      On May 7, 2019, Defendant received a draft letter from the Portsmouth-Paducah Program
20 Office ("Program Office") outlining ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Defendant's board met the next
23 day to discuss the letter. (Dkt. No. 72-16.) The following week, Brent Clark, an employee of
24 Defendant, e-mailed Leidos, a different cybersecurity firm, about the possibility that Leidos

---

[1] This Court previously concluded that a Continuous ATO is required based on the language in the prime contract. (Dkt. No. 65-1 at 9.)

1  could replace Plaintiff as the cybersecurity subcontractor. (Dkt. No. 72-18.)

2        On May 15, 2019, the Program Office sent Defendant an official letter ▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The Program Office sent a second letter detailing the

5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7        On May 21, 2019, Defendant sent Plaintiff a notice of default, claiming Plaintiff had

8  materially breached the subcontract and giving ten days to cure. (Dkt. No. 73-2.) Defendant also

9  sent two letters to the Program Office containing a corrective action plan to address the ten

10 action items in the May 15 letter and providing documentation to support its request for the

11 closure of six of the action items. (Dkt. Nos. 73-3, 90-9.) Around that time, Defendant

12 corresponded with representatives from Leidos to discuss hiring staff to potentially take over at

13 the Portsmouth Site. (Dkt. No. 73-4.)

14       The next week, Defendant submitted a second set of documents to support its request to

15 close certain items. (Dkt. No. 73-6.) Plaintiff responded to Defendant's notice of default,

16 requesting Defendant withdraw the notice, arguing it was ineffectual. (Dkt. No. 73-7.) According

17 to Defendant, on June 3, it met with the Program Office to obtain DOE's response to the

18 corrective action plan. (Dkt. No. 90 at 11.) DOE informed Defendant that it did not agree that

19 many of the deficiencies had been cured. (*Id.*) That same day, Defendant informed Plaintiff that

20 it had failed to cure its default and terminated the subcontract. (Dkt. No. 73-8.)

21       On June 18, Defendant met again with the Program Office to discuss the corrective action

22 plan. (Dkt. No. 73-9.) DOE sent Defendant a letter the following week agreeing to close out four

23 out of the ten action items. (Dkt. No. 73-11.) Following Plaintiff's termination, Leidos took over

24 as the cyber security subcontractor. (Dkt. No. 90 at 12–13.) In February 2020, DOE formally

25 determined all ten action items were completed and closed the corrective action plan. (Dkt. No.

26 74-1.) DOE ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ through the end of the Prime Contract, which

ended in early 2022; and it imposed the full course of penalties on Defendant, totaling nearly $865,000. (Dkt. No. 90 at 12.)

Plaintiff sued in state court for breach of contract and breach of the implied duty of good faith and fair dealing, challenging Defendant's termination of the subcontract. (Dkt. No. 13-1.) Defendant removed to this Court and counterclaimed to recover the amounts deducted by DOE, legal fees, and other unspecified damages. (Dkt. Nos. 1, 21 at 13–24.) Defendant filed a motion for partial summary judgment, which this Court granted in part, deciding (1) the Prime Contract made Defendant responsible for cyber security at the Portsmouth Site, (2) "Cyber Security requirements" were incorporated into the subcontract, and (3) Plaintiff was responsible for working with Defendant to address the issues raised in DOE's May 16, 2019 letter. (Dkt. No. 65-1 at 7.)

Plaintiff now brings this motion for summary judgment, asking the Court to conclude as a matter of law that the undisputed facts prove Defendant breached the subcontract and breached the implied covenant of good faith and fair dealing. (Dkt. No. 72.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49.

Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B.    Choice of Law**

Defendant raises the issue of choice of law here for the first time after multiple rounds of briefing, arguing "Federal Procurement Law" should apply based on the subcontract's choice of law provision. (Dkt. No. 85 at 17.) However, the relevant provision states "the body of law applicable to the procurement of goods and services by the Federal Government" applies only if the claim is "related to federal contract work." (Dkt. No. 72-3 at 20.) Although the Prime Contract is a federal contract, the main claim here is that Defendant breached a subcontract between two private parties. Because the claim is, therefore, not directly related to federal contract work, Idaho law applies.[2]

**C.    Breach of Contract**

Plaintiff argues that Defendant's actions after issuing the notice of default made it impossible for Plaintiff to perform its contractual duties. (Dkt. No. 74-3 at 16.) Plaintiff contends Defendant's decision to terminate was predetermined and Plaintiff never had a reasonable opportunity to address the items raised in the notice of default. (*Id.*) Defendant counters that Plaintiff was in material breach of the subcontract, Plaintiff did not provide assurances that it could cure the breach within ten days, and it was highly unlikely Plaintiff would be able to cure within the ten days or any timeframe remotely after. (Dkt. No. 85 at 17, 21.)

Plaintiff argues in the alternative that even if it did breach the subcontract, Defendant lost

---

[2] The parties cite to various cases that apply federal procurement law. (*See, e.g.*, Dkt. No. 85 at 19, Dkt. No. 92 at 9–13.) This Court declines to consider these cases to the extent that they differ from Idaho law.

the opportunity to terminate the contract based on the breach when it interfered with Plaintiff's ability to cure the breach. (Dkt. No. 74-3 at 18.) Defendant counters that it gave Plaintiff the full cure period and none of Defendant's claims of interference had any impact on Plaintiff's ability to perform under the contract. (Dkt. No. 85 at 23.)

A material breach of contract is one which "touches the fundamental purpose of the contract and defeats the object of the parties entering into the contract." *Ervin Constr. Co. v. Van Orden*, 874 P.2d 506, 510 (Idaho 1993). If one party has committed a material breach, the other party may terminate the contract. *Id.* at 511. Whether a breach of contract is material is a factual question. *Id.* A non-breaching party who interferes with a breaching party's ability to cure cannot rely on the breach to terminate the contract. *Id.* at 510–11.

Defendant asserts its termination of the contract was justified because Plaintiff committed a material breach. Plaintiff alleges various actions by Defendant made it impossible for Plaintiff to perform making it improper for Defendant to rely on the breach to terminate the contract.

Plaintiff first argues that Defendant planned for the inevitable termination by discussing a replacement plan with another security firm prior to termination of the contract. (Dkt. No. 74-3 at 22; *see* Dkt. Nos. 73-4, 73-5 (e-mails from Defendant to Leidos).) Defendant counters that, given the cyber security requirements imposed by DOE, it was proper to begin discussing a replacement contract to ensure continuity of services should Plaintiff fail to cure. (Dkt. No. 85 at 24–25; *see* Dkt. No. 72-2 at 33 (Prime Contract clause requiring services under the contract be continued without interruption).) Plaintiff also alleges Defendant prohibited Plaintiff from talking with the Program Office about the issues raised in the default letter. (Dkt. No. 74-3 at 17; *see* Dkt. No. 73-2 at 4 (default letter from Defendant).) Defendant argues that Plaintiff's IT manager was in contact with the Program Office, and that the restriction was intended to ensure Defendant was not left out of the chain of communication. (Dkt. No. 85 at 24; *see* Dkt. Nos. 90 at 9–10 (declaration from project manager for Defendant), 87-1 at 53–54 (deposition of vice president for Plaintiff).) Plaintiff also contends Defendant withheld relevant letters from the

Program Office about DOE's performance concerns. (Dkt. No. 74-3 at 17; *see* Dkt. No. 72-6 at 37 (deposition of project manager for Defendant).) Defendant argues this is irrelevant because Plaintiff received all the information contained in the letters even if it did not receive physical copies of the actual letters. (Dkt. No. 85 at 23.)

Finally, Plaintiff claims Defendant requested unreasonable corrective actions that could not be achieved in the ten-day cure period, as cover for its predetermined decision to terminate the subcontract. (Dkt. No. 74-3 at 16–17); *see* Dkt. Nos. 72-13, 72-14 (tables detailing deadlines for tasks).) To support this contention, Plaintiff also points to a letter sent only one day into the cure period by Defendant to the Program Office stating Defendant had "executed a Termination for Default with [Plaintiff]. . ." (Dkt. No. 92 at 7) (quoting Dkt. No. 73-3 (letter from Defendant to Program Office).) Defendant responds that although it was unlikely Plaintiff would be able to cure, it nonetheless waited the entire cure period to give Plaintiff the opportunity to do so. (Dkt. No. 85 at 19; *see* Dkt. No. 90 at 11–12 (declaration from project manager for Defendant).[3])

Viewing these facts in the light most favorable to the non-moving party, Defendant has presented sufficient evidence to raise a genuine issue of material fact about whether Plaintiff was initially in material breach, and if so, whether Defendant interfered in way that made it impossible for Plaintiff to cure its breach and whether Defendant waited the entire cure period before deciding whether to terminate the subcontract. Accordingly, the Court denies Plaintiff's motion for summary judgment for its claim of breach of contract.

### D.     Breach of Covenant of Good Faith and Fair Dealing

Next, Plaintiff argues that Defendant violated the implied covenant of good faith and fair dealing. (Dkt. No. 74-3 at 19.) In support, Plaintiff points to language in the subcontract that states that Defendant may terminate the subcontract if Plaintiff fails to perform and does not cure

---

[3] Plaintiff argues Defendant cannot rely on a declaration that embellishes a prior deposition testimony to create a disputed issue of material fact. (Dkt. No. 92 at 6–8.) However, Defendant's supporting declaration does not embellish the facts presented or present new facts. Instead, the declaration draws inferences from the facts already before the Court.

"within a period of 10 days (or such longer period as [Defendant] may authorize in writing; or such shorter period as may be directed by [DOE])." (Dkt. No. 72-3 at 22.) Plaintiff argues that because Defendant had the option to provide a longer cure period, Defendant was obligated by the covenant of good faith and fair dealing to exercise its discretion. (Dkt. No 74-3 at 20.) Plaintiff argues in the alternative that even if Defendant had a right to impose a ten-day cure period, it did so in bad faith knowing Plaintiff could not cure in that amount of time. (*Id.*)

The implied covenant of good faith and fair dealing requires parties to perform their obligations in good faith, and a violation occurs when either party violates, nullifies, or significantly impairs any benefit of the contract. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 863 (Idaho 1991). There is no breach of implied covenant of good faith and fair dealing when a party merely exercises its rights under the contract. *First Security Bank of Idaho v. Gaige*, 765 P.2d 683, 687 (Idaho 1988). An unambiguous contract will be given its plain meaning. *Bakker v. Thunder Spring-Wareham, LLC*, 108 P.3d 332, 337 (Idaho 2005). A contract is ambiguous if it is reasonably subject to conflicting interpretations. *Id.*

Plaintiff's first assertion, that Defendant was obligated to exercise discretion to provide a longer cure period, fails as a matter of law. The terms of the subcontract clearly and unambiguously state Plaintiff has a default period of ten days to cure any breach (Dkt. No. 72-3 at 22.) Although the subcontract provides Defendant discretion to authorize a longer cure period, there is no language *requiring* Defendant do so. (*Id.*) Thus, Defendant did not breach the implied covenant of good faith and fair dealing by declining to exercise its discretion to authorize a longer cure period.

Plaintiff also argues Defendant imposed the ten-day cure period in bad faith and intended to terminate regardless of any actions Plaintiff took to cure. However, as outlined in the previous section, when viewing the facts in the light most favorable to the non-moving party, Defendant has provided sufficient evidence to support its claim that the ten-day cure period was offered in good faith. Given that there is a genuine issue of material fact whether Defendant provided

Plaintiff the full cure period, the Court denies Plaintiff's for summary judgment on the claim that Defendant violated the implied covenant of good faith and fair dealing.

### E. Motion to Seal

Plaintiff asks to seal its motion for summary judgment (Dkt. No. 72), supporting memorandum (Dkt. No. 74-3), statement of undisputed Facts (Dkt. No. 82), and supporting exhibits (Dkt. Nos. 72–74). Defendant likewise asks to seal its response to Plaintiff's motion for summary judgment (Dkt. No. 85), supporting declarations (Dkt. Nos. 87–90), and statement of disputed material facts (Dkt. No. 86). Although there is a strong presumption of public access to court records, the presumption may be overcome if there is a specific factual basis for finding that sufficiently compelling reasons outweigh the public's interest in transparency and disclosure. *See, e.g.*, *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1134–35 (9th Cir. 2003). As previously noted, the national security implications of the subject matter at issue are obvious. These motions are GRANTED.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 72) is DENIED. The motions to file documents under seal (Dkt. Nos. 71, 84) are GRANTED. This Order shall be filed under seal and the Clerk shall maintain Docket Numbers 72–74, 78, 82, 85–90, and 92 under seal. The parties are ORDERED to submit a redacted version of this Order within two weeks of its filing.

DATED this 26th day of September 2022.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE